# EXHIBIT C

UNITED STATES
DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Martin and Doneyn Bourke )<br>    Plaintiffs )<br> )<br>v. )<br> )<br>Retained Realty, Inc., Stephen P. )<br>Hayes, Hayes & Hayes, Attorneys )<br>At Law, PC, )<br>    Defendants )<br>               ) | Case No. 13-11537-RWZ |

### AFFIDAVIT OF DONEYN BOURKE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT RETAINED REALTY'S MOTION TO DISMISS

I, Doneyn Bourke, being duly sworn do hereby depose and swear of my own personal knowledge to the best of my knowledge and belief as follows:

1.) I am a Plaintiff in the above-entitled matter and am familiar with the facts of this case.

2.) On or about April 17, 2008, I executed a mortgage and related documents for a loan on property located at 6 Arkansas Avenue, Nantucket, MA with Emigrant Mortgage Company, Inc. ("Emigrant"). A copy of the mortgage as publicly recorded is attached to Ex. 1 hereto.

3.) My husband Martin and I used the moneys for personal and household reasons - to move an existing home on Nantucket to the property and renovate it for us to live in.

4.) We currently live in the property and have at all pertinent times in this case.

5.) In 2009 we began to suffer financial difficulty due to the faltering economy and we fell behind on the Emigrant mortgage.

6.) In May 2010, I filed for Chapter 11 bankruptcy in case no. 10-bk-15232. I was told we had to file Chapter 11 (personal) because of the amount of debt we had (well over $1 million).

7.) In August 2010, Emigrant filed a Motion for Relief from the Automatic Stay to foreclose on the mortgage. In their motion, Emigrant claimed to be the owner of the loan and that it was in default. See Ex. 2. We voluntarily dismissed the bankruptcy case in November 2010.

8.)   I don't know whether Emigrant owned the loan in August 2010, but they said they said they did.  I don't believe this until they prove it.  I do not deny that I was in default of the mortgage payments at that time.

9.)   In January 2011 advertisements appeared in the local paper advertising our property for sale at a foreclosure sale on January 27, 2011.

10.)   I never received any notices under G.L. c. 244, s. 14 telling me that an auction had been scheduled for the property.

11.)   On January 22, 2011, my lawyer rescinded our loan with Emigrant by sending them a letter.  A copy of this letter is attached at Ex. 3.  Emigrant never responded to this rescission request.

12.)   No one ever made any "public proclamations" at the property regarding any postponements of any scheduled foreclosure sales on January 27, 2011, February 11, 2011 or March 3, 2011.

13.)   I was totally unaware that a foreclosure sale supposedly took place at my property on March 21, 2011 and that the property had supposedly been sold.

14.)   No one came onto – or "entered" - my property on March 21, 2011 at any purported foreclosure sale.

15.)   The first I knew of any purported foreclosure sale was in February 2013 when my lawyer received a "Notice to Vacate" from the law offices of Hayes & Hayes on behalf of a company called "Retained Realty" who says they bought our property at a foreclosure sale in March 2011.

16.)   That the property had supposedly been sold at a foreclosure sale was a total shock to me.  I never heard of Retained Realty and have never received any letters or notices from Retained Realty about the property - ever.

17.)   The Notice to Vacate said we "were liable" to Retained $100.00 per day for more than two (2) years for "use and occupancy".  I took this to mean that this was money we were required to pay Retained.   But before the date of the Notice to Vacate, no demand was ever been made on us for any moneys for "use and occupancy" or rent - or any other reason - by Retained or anyone saying they were representing Retained.

18.)   Our lawyer sent a request for debt validation to Retained and Hayes & Hayes. See Ex. 4.  This letter was also a demand under G.L. c. 93A.  Neither Retained nor Hayes & Hayes ever responded to this letter.

19.)   Instead of responding to the request for debt validation and the 93A letter, Retained and Hayes & Hayes sued us in Nantucket District Court to evict us from

2

our house and for more than $69,000.00 they claim we owe Retained for "use and occupancy" after March 2011.

20.)    We do not owe Retained anything – their demand(s) for payment of any moneys they say that we are liable to them for are rejected.  In our response to the eviction they brought, we have alleged the foreclosure of our property was unlawful, invalid and void and that Retained does not have the right to evict us or obtain any moneys from us.

Executed under the pains and penalties of perjury this 29th day of July, 2013.

Doneyn Bourke

3

123757

Return To:
Emigrant Mortgage Company, Inc

7 Westchester Plaza
Elmsford, New York   10523
914-785-1100

Prepared By:
Anissa Andrews

Elmsford, New York   10523
914-785-1100



2008 00123757
Cert: 22157    Doc: MTG
Registered: 04/22/2008 11:30 AM



——————————————[Space Above This Line For Recording Data]——————————————

4896560

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated   April 17th, 2008   ,
together with all Riders to this document.
(B) "Borrower" is  Doneyn Bourke and William Hayward, Sr.

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is  Emigrant Mortgage Company, Inc

Lender is a  Corporation
organized and existing under the laws of   The State of New York   .

**MASSACHUSETTS**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3022  1/01

-6(MA) (0401).01
Page 1 of 15            Initials:
     VMP Mortgage Solutions, Inc.

Lender's address is  7 Westchester Plaza, Elmsford, New York   10523

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated   April 17th, 2008   .
The Note states that Borrower owes Lender  Nine Hundred Fifty Thousand and  no/100.
                                                                        Dollars

(U.S. $   950,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   May 1st, 2038        .

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |

Rider to Mortgage         Rider R
Rider S

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

Initials: _____

VMP-6(MA) (0401).01                     Page 2 of 15                       Form 3022  1/01

**(P)** "**Successor In Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the                         County                         [Type of Recording Jurisdiction]
of                         NANTUCKET                 [Name of Recording Jurisdiction]:
See Schedule "A" attached hereto and made a part hereof.

Parcel ID Number:                                                    which currently has the address of
                                6 ARKANSAS AVENUE                                    [Street]
                NANTUCKET                            [City], Massachusetts 02554-2502 [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.
    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    **1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

Initials: _____

-6(MA) (0401).01                          Page 3 of 15                          Form 3022   1/01

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.  Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

123757

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials: ___

-6(MA) (C401).01                          Page 6 of 16                          Form 3022   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

123757

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

123757

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials:

LOAN ID: 4896560

BORROWER(S): Doneyn Bourke
William Hayward, Sr.


RE: 6 ARKANSAS AVENUE, NANTUCKET, MASSACHUSETTS  02554-2502




**RIDER "R"**



In addition to any other requirements specified in the Commitment, Note, and/or Security Instrument, Borrower will certify to Lender (at, or prior to, closing) by means of a notarized affidavit, that they will occupy the above referenced premises. Furthermore, the above referenced premises will not be rented or subleased, as the case, may be during the first __3__ years of the loan term.

Failure to abide by this agreement shall be deemed an event of default under the Note and Security Instrument and the Lender may exercise its rights including, but not limited to, accelerating the unpaid balance of the loan and/or imposition of the default interest rate.

Lender may, at its sole option, choose to inspect the premises and/or require documentation to support owner occupancy.







Accepted and Agreed to: _Doneyn Bourke_____  Date: _4/7/08_
　　　　　　　　　　　　Doneyn Bourke

Accepted and Agreed to: _William A Hayward Jr_  Date: _4/7/08_
　　　　　　　　　　　　William Hayward, Jr.

Accepted and Agreed to: _____  Date: _____

Accepted and Agreed to: _____  Date: _____




4/16/2008 4:19:15 PM                    02/25/00 RIDRR1 (Standard)

123757

LOAN ID: 4896560

BORROWER(S):  Doneyn Bourke
              William Hayward, Sr.

RIDER "S"

NOTWITHSTANDING anything to the contrary stipulated in the Commitment, Note and/or Security
Instrument, Lender shall permit a second mortgage by 'Any Lender'
up to     $210,000    (subordinated only to Emigrant's 1st lien associated with Loan Number 896560     ).

Accepted and Agreed to: _____  Date: 4 17 00
                        Doneyn Bourke

Accepted and Agreed to: _____  Date: 4 17 08
                        William Hayward, Sr.

Accepted and Agreed to: _____  Date: _____

Accepted and Agreed to: _____  Date: _____

4/16/2008 4:19:15 PM                              03/06/00 RS2NDF

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

**EX. 2**

IN RE:

DONEYN E. BOURKE                           Case No.: 10-15232-WCH
Debtor                                     Chapter 11

### MOTION FOR RELIEF FROM AUTOMATIC STAY

TO THE HONORABLE WILLIAM C. HILLMAN:

Emigrant Mortgage Company, Inc. together with its successors and assigns
("Movant"), your moving party in the within Motion, respectfully represents as follows:

1.      Movant is an entity with a mailing address of 6 East 43rd Street, 10th
Floor, New York, NY 10017.

2.      The debtor, Doneyn E. Bourke (the "Debtor"), is an individual who has a
mailing address of 6 Arkansas Avenue, Nantucket, MA 02554.

3.      The Debtor and William S. Hayward are the obligors pursuant to
promissory note (the "Note") dated April 17, 2008, in the original principal amount of
$950,000.00.   The Note states that it is signed by Williams Hayward, Sr. for the sole
purpose of assuring perfection of a mortgage lien by the Note holder on the property
currently owned by Doneyn Bourke and William Hayward, Sr. to secure the loan
evidenced by the Note and is not intended to create any personal obligation of William
Hayward, Sr. for the amounts due under the Note.  A copy of the Note is annexed as
Exhibit "A".

4.      To secure the Note, the Debtor and WilliamS. Hayward, Sr. executed in
favor of, and delivered a mortgage to Emigrant Mortgage Company, Inc. (the
"Mortgage", together with the Note and any other loan documents executed in

connection therewith, the "Loan Documents") dated April 17, 2008, securing the Note

and encumbering the property located at 6 Arkansas Avenue, Nantucket, MA 02554 (the

"Property"). A copy of the Mortgage is annexed as Exhibit "B".

5.     There is no other collateral to secure the Note.

6.     Movant is the current holder of the Loan Documents.

7.     On May 13, 2010, the Debtor filed a petition under Chapter 11 of the

United States Bankruptcy Code in the United States Bankruptcy Court for the District of

Massachusetts.

8.     As of August 19, 2010, the total amount due and owing pursuant to the

Loan Documents was $1,092,007.94 in principal, accrued interest, late charges,

miscellaneous fees, and attorneys' fee and costs.

9.     There is a pre-petition arrearage in the amount of $129,797.28 due and

owing under the Loan Documents.

10.     As of August 19, 2010, there is a post-petition payment arrearage owing

under the Loan Documents in the amount of $36,378.40.  This amount represents the

May 2010 through and inclusive of August 2010 payments of $35,450.84 and late

charges of $927.56.  This amount is exclusive of attorneys' fees, costs, and expenses in

connection with this Motion.

11.     The regular monthly payment due at this time is approximately $8,862.71.

12.     According to the Debtor's Schedules there are outstanding real estate taxes

owing to the municipality in which the Property is located.

13.     The total amount of encumbrances on the Property is approximately

$1,306,958.75, *which includes the following encumbrances in addition to the Mortgage:*

    a. *A Scheduled lien to CFF Services in the amount of $210,000.00.*

      b.  *A Scheduled lien to Nantucket Tax Collector in the amount of $4,951.81.*

14.      There is aDeclaration of Homestead recorded on the Property at the present time.

15.      The Debtor's Schedules list a fair market value for the Property of $2,235,000.00.

16.      For purposes of this Motion only, Movant asserts that the liquidation value of the Property is $2,100,350.00, calculated at the Debtor's value less a reasonable realtor's fee of 6%; and costs incurred in a real estate closing estimated to be $550.00.

17.      Movant seeks relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1) for cause on the basis that the Debtor is in default of the payment obligations resulting in an arrearage owing under the Loan Documents.

WHEREFORE, Movant requests that the Court:

(1) grant relief from the section 362 automatic stay and the stay imposed by Bankruptcy Rule of Procedure 4001(a)(3) for the purpose of exercising its various non-bankruptcy rights and remedies including, without limitation:

a.  taking possession of the Property, obtaining a deed-in-lieu of foreclosure and/or foreclosing the Mortgage

b.  taking such action as may be necessary to evict the Debtor or any occupant from the Property.

(2) order such other and further relief as may be just and proper.

MOVANT
By Its Attorney,

/s/ Shawn M. Masterson, Esq.
Thomas E. Carlotto, Esq.  BBO# 640277
Shawn M. Masterson, Esq.  BBO# 658276
Shechtman Halperin Savage, LLP
1080 Main Street
Pawtucket, Rhode Island  02860
(401) 272-1400 phone
Dated: August 27, 2010                (401) 272-1403 fax


## CERTIFICATE OF SERVICE

The undersigned does hereby certify that the Motion for Relief from Automatic Stay and the proposed Order were served upon the following parties by causing true and correct copies of the same to be sent via electronic notice or via first class mail postage pre-paid, as indicated, on August 27, 2010:

Via Electronic Notice:

Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109
USTPRegion01.BO.ECF@USDOJ.GOV

Nina M. Parker, Esq.
10 Converse Place
Winchester, MA 01890
nparker@ninaparker.com
Debtor's counsel


Via First Class Mail:

Doneyn E. Bourke
6 Arkansas Avenue
Nantucket, MA 02554
Debtor

4

William Hayward, Sr.
6 Arkansas Avenue
Nantucket, MA 02554
Co-Mortgagor

Martin Bourke
6 Arkansas Ave.
Nantucket, MA 02554
Co-Debtor

Town of Nantucket
16 Broad Street
Nantucket, MA 02554

CFF Services
37 Old South Road
Nantucket, MA 02554
Creditor

Recovery Management Systems Corporation
25 S.E. 2nd Avenue, Suite 1120
Miami, FL 33131
claims@recoverycorp.com
Creditor

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Massachusetts Department of
Revenue
Bankruptcy Unit
P.O. Box 9564
Boston, MA 02114-9564

/s/ Shawn M. Masterson, Esq.

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

IN RE:

    DONEYN E. BOURKE                     Case No.: 10-15232-WCH
                                                        Chapter 11

### ORDER

This matter having come before the Court on the Motion for Relief from Automatic Stay ("the Motion") filed by Emigrant Mortgage Company, Inc. together with its successors and assigns ("Movant"), and good cause having been shown, and proper notice having been given, it is hereby

### ORDERED, ADJUDGED AND DECREED

(1)     that the Motion is granted; and

(2)     that Movant is granted relief from the section 362 automatic stay and the stay imposed by Bankruptcy Rule of Procedure 4001(a)(3) for the purpose of exercising its rights under its agreements with the Debtor and under applicable law, including, without limitation, foreclosing the Mortgage, as defined in the Motion, encumbering the property located at 6 Arkansas Avenue, Nantucket, MA 02554, and bringing such action, including eviction proceedings, as may be appropriate, pursuant to state and federal law.

So Ordered this _____ day of _____, 2010.

                                          _____
                                          United States Bankruptcy Judge

FROM EMIGRANT SAVINGS                    (WED) 4 16' 08 15:56/ST. 15:55/NO. 4864978270 P 2

# ADJUSTABLE RATE NOTE   Loan #: ~~~~~~~~~~

(1 Year Treasury Index - Rate Caps)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND
MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN
CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

April 17th, 2008                    Nantucket                    Massachusetts
[Date]                              [City]                       [State]

6 ARKANSAS AVENUE, NANTUCKET, MASSACHUSETTS 02554-2502
[Property Address]

**1.   BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $   950,000.00   (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is Emigrant Mortgage Company, Inc

I will make all payments under this Note in the form of cash, check or money order.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of   9.125   %. The interest rate I will pay will change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any
default described in Section 7(B) of this Note.

**3.   PAYMENTS**

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the first day of each month beginning on   June 1st, 2008
I will make these payments every month until I have paid all of the principal and interest and any other charges described below
that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to
interest before Principal. If, on   May 1st, 2038   , I still owe amounts under this Note, I will pay those amounts in
full on that date, which is called the "Maturity Date."
I will make my monthly payments at 7 Westchester Plaza, Elmsford, New York   10523

or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $   7,729.52   . This amount may change.

(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must
pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with
Section 4 of this Note.

MULTISTATE ADJUSTABLE RATE NOTE - ARM 5-2 - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Fannie Mae 4-2/5-2/6-2 ARM                                                         Form 3502 1/01

~~~~-822N (0205).02
VMP Mortgage Solutions, Inc. 1(800)521-7291
Page 1 of 3                    Initials: DEB  VH

EXHIBIT
A

FROM EMIGRANT SAVINGS                                    (WED) 4. 16' 08 15:56/ST. 15:55/NO. 4864978278 P 3

**4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**
The interest rate I will pay may change on the first day of  May  2013                , and on that day every 12th month
thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield
on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve
Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."
If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information.
The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding   Three  and  three
eighths                                        percentage points (    3. 375        %) to the Current Index. The
Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125 %). Subject to
the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid
principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal
payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than        14. 125        % or less
than       4. 125       %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by
more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My
interest rate will never be greater than        14. 125       %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment
beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly
payment before the effective date of any change. The notice will include information required by law to be given to me and also
the title and telephone number of a person who will answer any question I may have regarding the notice.

**5.   BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.
I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payment
unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly
payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment
may be offset by an interest rate increase.

**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other
loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge
shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from

CMB-022N (02021.02                                    Page 2 of 4                                    Form 3502  3/01

FROM EMIGRANT SAVINGS                              (WED) 4. 16' 09 15:56/ST. 15:55/NO. 4864978278 P  4

me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of     Fifteen    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be     3.000    % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as

MB-822N(0002).02                                     Page 3 of 4                                     Form 3800   9/01

FROM EMIGRANT SAVINGS                          (WED) 4. 16' 08  15:57/ST. 15:55/NO. 4864978278  P  5

this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Doneyn Bourke                      -Borrower          William Hayward Sr. *                 -Borrower

_____ (Seal)          _____ (Seal)
                                   Borrower                                               Borrower

_____ (Seal)          _____ (Seal)
                                   Borrower                                               Borrower

_____ (Seal)          _____ (Seal)
                                   Borrower                                               Borrower

* This Note is signed by William Hayward Sr. for the sole purpose of assuring perfection of a mortgage lien held by the Note holder on the property currently owned by Doneyn Bourke and William Hayward    [Sign Original Only]
Sr. to secure the loan evidenced by this Note and is not intended to create any personal obligation of
William Hayward Sr. for the amounts due under this Note.

VMP®-822N (0302).01                          Page 4 of 4                          Form 3802  1/01

## RIDER TO NOTE

This rider is made as of the 17th                day of April 2008                , and is incorporated into and shall be deemed to amend and supplement the Note of the same date given by the undersigned (the "Borrower") to evidence the Borrower's Note (the "Note") to Emigrant Mortgage Company Inc., (the "Lender") of the same date.

12.        The Lender's address is 7 Westchester Plaza, Elmsford, New York 10523.

13.        In addition to the principal and interest payment provided for in Paragraph 3(A) of the Note, I will also include in my monthly payment escrow items as described in Paragraph 3 of the Security Instrument and will make my monthly payments to the Lender or at a different place, if required by the Note Holder.

14.        I agree to make an interest only payment on Apr11 22, 2008

15.        The Index reference in Paragraph 4(B) is published in the Federal Reserve Bulletin and made available each week by the Federal Reserve Board in Statistical Release H.15(519).

16. ☐    If this box is checked, I may make a full prepayment or partial prepayment before they are due at any time, however, I will be assessed a prepayment penalty as set forth in the attached rider.

17.        Notwithstanding the provision of 7(A) of the Note, the amount of the charge will be N/A     % of my total payment, which includes principal, interest and the escrow items as described in Paragraph 3 of the Security Instrument. This provision does not apply to loans secured by property in the following states: Massachusetts.

18.        Section 11 of the Note is amended in its entirety to read as follows:

### 11.  UNIFORM SECURED NOTE

(A) This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) To the extent permitted by Applicable Law, the Note Holder may charge a reasonable fee as a condition to the Note Holder's consent to a loan assumption. The Note Holder may also require the transferee to sign an assumption agreement that is acceptable to the Note Holder and that obligates the transferee to keep all the promises and agreements made in this Note and in the Security Instrument. Borrower will continue to be obligated under this Note and the Security Instrument unless the Note Holder releases Borrower in writing.

19.    In the event of any assignment or transfer of the Note and Security Instrument to the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, the provisions of Paragraph 12 through 18 herein shall upon such assignment or transfer cease to be operational and shall be null and void.

By signing this Rider, I agree to all of the above.

Doneyn Bourke

LOAN ID:

BORROWER(S): Doneyn Bourke

RE: 6 ARKANSAS AVENUE, NANTUCKET, MASSACHUSETTS   02554-2502

RIDER "R"

In addition to any other requirements specified in the Commitment, Note, and/or Security
Instrument, Borrower will certify to Lender (at, or prior to, closing) by means of a notarized
affidavit, that they will occupy the above referenced premises. Furthermore, the above referenced
premises will not be rented or subleased, as the case, may be during the first __3__ years of the
loan term.

Failure to abide by this agreement shall be deemed an event of default under the Note and Security
Instrument and the Lender may exercise its rights including, but not limited to, accelerating the
unpaid balance of the loan and/or imposition of the default interest rate.

Lender may, at its sole option, choose to inspect the premises and/or require documentation to
support owner occupancy.

Accepted and Agreed to: _Doneyn Bourke_          Date: _4/17/08_
Doneyn Bourke

Accepted and Agreed to: _____          Date: _____

Accepted and Agreed to: _____          Date: _____

Accepted and Agreed to: _____          Date: _____

4/16/2008 4:16:24 PM                    02/25/00 RIDER R (Standard)

LOAN ID:

BORROWER(S): Doneyn Bourke

RIDER "S"

NOTWITHSTANDING anything to the contrary stipulated in the Commitment, Note and/or Security Instrument, Lender shall permit a second mortgage by  'Any Lender' up to     $210,000   (subordinated only to Emigrant's 1st lien associated with Loan Number 896560    ).

Accepted and Agreed to:  _____   Date: _____
                         Doneyn Bourke

Accepted and Agreed to:  _____   Date: _____

Accepted and Agreed to:  _____   Date: _____

Accepted and Agreed to:  _____   Date: _____

4/16/2008 4:16:24 PM                                     01/04/08 RS3HDF

May. 9. 2008 11:07AM · · ·                                    No. 0816   P. 14

*Bourke*

123757

Colt: 22157    Doc: MTG
Registered: 04/22/2008 11:30 AM

Return To:
Emigrant Mortgage Company, Inc

7 Westchester Plaza
Elmsford, New York   10523
914-785-1100

Prepared By:
Anissa Andrews

Elmsford, New York   10523
914-785-1100

[Space Above This Line For Recording Data]

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated    April 17th, 2008
together with all Riders to this document.
(B) "Borrower" is Donayn Bourke and William Hayward, Sr.

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is  Emigrant Mortgage Company, Inc

Lender is a  corporation
organized and existing under the laws of   The State of New York

MASSACHUSETTS-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3022  1/01

-6(MA) (0411).01
Page 1 of 12
VMP Mortgage Solutions, Inc.

EXHIBIT
B

May. 9. 2008 11:07AM                                                    No. 0816    P. 15

123787

Lender's address is 7 Westchester Plaza, Elmsford, New York  10523

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated   April 17th, 2008 .
The Note states that Borrower owes Lender  Nine Hundred Fifty Thousand and  no/100.
_____ Dollars
(U.S. $  950,000.00     ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   May 1st, 2038

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |

Rider to Mortgage           Rider R
Rider R
(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(K) "Escrow Items" means those items that are described in Section 3;

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

NY50-6(NY) (0811).01              Page 2 of 15              Form 3022  1/01

May. 9. 2008 11:06AM                                                    No. 9816   P. 16

123757

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the _____ _____ of _____
                                    [Type of Recording Jurisdiction]
of _____ NANTUCKET _____                   [Name of Recording Jurisdiction]
                  County
see schedule "A" attached hereto and made a part hereof.

Parcel ID Number:                                    which currently has the address of
                 6 ARKANSAS AVENUE                                    [Street]
      NANTUCKET                [City], Massachusetts 02554-2502 [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

-6(MA) (0105)01                        Page 3 of 15                         Form 3022   1/01